**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SB: 236805)
117 East Colorado Blvd.
Suite 600
Pasadena, CA 91105
213-723-0707
ekim@lcllp.com

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CALVERT, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>META PLATFORMS, INC.,<br><br>            Defendant. | Case No. 3:25-cv-06406<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

"We need to take a more proactive role and a broader view of our responsibilities. It's not enough to just build tools. We need to make sure they're used for ***good.***"

Mark Zuckerberg, CEO, Meta Platforms

## CLASS ACTION COMPLAINT

1.      Plaintiff Brian Calvert ("Plaintiff"), on behalf of himself and all others similarly situated, asserts the following against Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## NATURE OF THE ACTION

2.      In 2004, Mark Zuckerberg launched TheFacebook.com as a directory and social network for Harvard students.[1] Facebook, now Meta, has since grown, becoming one of the world's largest advertising companies.

3.      According to Meta's Annual 10-K, "[c]urrently, we generate substantially all of our revenue from selling advertising placements on our family of apps to marketers."[2]

4.      To operate its advertising business, Meta relies on the tracking tool "Meta Pixel."

5.      Meta Pixel is a snippet of JavaScript code embedded on a third-party website that tracks users' actions as they navigate through the website. It logs the pages they visit, the buttons they click, the information they type, and more.[3] Meta Pixel then sends this harvested information to Meta, where it can be stored for years.[4]

6.      The Meta Pixel is marketed towards third parties that use Facebook Ads as a way to "make sure [their] ads are shown to the right people." Meta boasts that Meta Pixel allows third parties to

---

[1] Alan Taback, *Hundreds Register for New Facebook Website* (Feb. 9, 2004), https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/.
[2] Meta Platforms, Inc., U.S. S.E.C. Form 10-K, (Jan 30, 2025). https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/a8eb8302-b52c-4db5-964f-a2d796c05f4b.pdf.
[3] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022) ("Feathers et al."), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[4] Facebook Business Tools Terms, https://m.facebook.com/legal/terms/businesstools, (last visited July 30, 2025).

improve users' experiences on their websites, target advertisements more effectively, and drive more sales.[5]

7.     These benefits appeal to third-party websites; 30% of the 100,000 most popular websites use Meta Pixel, and Meta has reported that millions of iterations of its Pixel are on websites across the Internet.[6]

8.     Recently, it was discovered that Meta was unlawfully monitoring Android smartphone users' web traffic. When an Android user accessed either the Facebook or Instagram applications on their phone, then eventually placed the application into the background, the application would begin listening for communications recorded, intercepted, redirected, and transmitted via the Meta Pixel.[7]

9.     The Meta Pixel recorded, transmitted, and exploited event-level data about the user's interaction with websites. Event-level data tracking includes but is not limited to tracking when a user adds payment information, adds an item to their cart, schedules an appointment, subscribes, views content, searches, and communicates with a representative of the website.[8]

10.     When a user accessed a website with the Meta Pixel embedded, the Meta Pixel would send the harvested data to the Facebook or Instagram application ("Native Applications") running in the background of the Android phone to link the consumer's web activity to their Instagram or Facebook account.[9]

11.     Plaintiff and Class members are users of Android phones who also had the Facebook and Instagram applications on their devices.

12.     By harvesting and transmitting user web browsing data back to native applications, Meta was able to deanonymize the web browsing of Android users, such as the Plaintiff and Class members.

---

[5] Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited July 30, 2025).

[6] The Markup, *How We Built a Meta Pixel Inspector* (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.

[7] *See* Aniketh Girish, Gunes Acar, Narseo Vallina-Rodriguez, Nipuna Weerasekara, Tim Vlummens, Disclosure: Covert Web-to-App Tracking via Localhost on Android, https://localmess.github.io/ (last visited July 30, 2025). ("Girish, et. al.")

[8]  *See* Facebook Meta Pixel Reference, Standard Events https://web.archive.org/web/20250531104925/https://developers.facebook.com/docs/meta-pixel/reference/ (archived May 31, 2025).

[9] *Id.*

Meta deanonymized the harvested data by linking users' web browsing activity to their Instagram and Facebook accounts. By linking Plaintiff's and Class members' web browsing data with their Facebook and Instagram accounts, Meta was making its targeted advertising product more valuable but doing so at the expense of the privacy of Plaintiff and Class members.

13.     Meta monetizes the information it receives through Meta Pixel by using it to generate highly profitable targeted advertising, the type of advertising on which Meta relies for the majority of its revenue.[10]

14.     The targeted advertising Meta offers for sale includes the ability to target users based on specific personal information. Meta Pixel did this with Android users through bypassing normal security and privacy protection tools.[11] Meta accomplished this data harvesting and eavesdropping by concealing how the Meta Pixel and the native applications were communicating.[12]

15.     Defendant's actions constitute an extreme invasion of Plaintiff's and Class members' right to privacy and violate federal and state statutory and common law.

16.     Plaintiff and Class Members seek legal and equitable relief.

### THE PARTIES

17.     Plaintiff Brian Calvert is a citizen and resident of the Commonwealth of Pennsylvania.

18.     Plaintiff maintains and uses both an Instagram and a Facebook account.

19.     Both the Instagram and Facebook applications are installed on Plaintiff's Samsung smartphone, which runs on the Android operating system.

20.     Defendant Meta Platforms, Inc. is a publicly traded corporation, incorporated in the state of Delaware, with a principal place of business at 1 Meta Way, Menlo Park, CA 94025. Meta has users and does business around the world, and throughout the individual states, territories, and commonwealths of the United States.

---

[10] *See,* Meta 10-K *supra.*
[11] Girish, et. al., *supra.*
[12] *Id.*

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members defined below, and minimal diversity exists because a significant portion of putative class members are citizens of a state different from the citizenship of at least one Defendant.

22. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 since this suit is brought under the laws of the United States.

23. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

24. This Court has general personal jurisdiction over defendant Meta, because Meta's headquarters are in California, making Meta essentially at home there. The Court's exercise of personal jurisdiction over defendant Meta would not offend traditional notions of fair play and justice under the Due Process Clause.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as defendant Meta is subject to personal jurisdiction in this district as if it were a separate state.

## FACTUAL BACKGROUND

A. Meta and Advertising

26. Following the campus-wide infamy of FaceMash, an online "hot or not" game in which Harvard students compared two students' photos and voted on who was "hotter," Mark Zuckerberg began writing code for a new website.[13] This new website would later come to be known as Facebook.

27. Facebook was launched in 2004 and reached its millionth registered user before the year's end. Merely four years later, Facebook had already reached the milestone of 100 million monthly active users.[14]

---

[13] Katharine Kaplan, *Facemash Creator Survives Ad Board* (Nov. 19, 2003), https://www.thecrimson.com/article/2003/11/19/facemash-creator-survives-ad-board-the/.
[14] The Associated Press, *Number of Active Users at Facebook Over the Years*, Yahoo (Oct. 23, 2012), https://finance.yahoo.com/news/number-active-users-facebook-over-years-214600186--

CLASS ACTION COMPLAINT

28.     In 2007, Mark Zuckerberg announced the launch of Facebook Ads which, even then, gave advertisers "access to data on activity, fan demographics, ad performance and trends that better equip marketers to improve custom content on Facebook and adjust ad targeting."[15] Just three years later, third-party advertising accounted for 95% of Facebook's revenue.[16]

29.     Advertising continues to account for the lion's share of Meta's revenue. In 2019, Meta brought in $69.66 billion in advertising revenue (98.5% of total revenue). In 2020, Meta brought in $84.17 billion in advertising revenue (97.9% of total revenue). In 2021, Meta brought in $117.93 billion in advertising revenue (97.5% of total revenue).[17]

30.     Despite its financial success, Meta's targeted advertising has been the subject of numerous controversies. For example, in June 2022, the Justice Department entered into a settlement agreement resolving allegations that Meta engaged in discriminatory advertising in violation of the Fair Housing Act ("FHA"). Meta's "Lookalike Ad" service allowed housing advertisers to target users based on race, gender, and other FHA-protected characteristics.

31.     Meta's targeted advertising has also been used to market antisemitic content to AI-identified antisemites,[18] to market diet programs to users with eating disorders,[19] to market weapons and

finance.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_s
ig=AQAAANpSrN2n4sKRGr12jtBZzUHTDb2xEJOlCpRlshEwWGsyM4Iod1yAJWMKksxlai44WgP2
LMk1642n4eWX7_6MtaBZWG1e5RvxW2ywyhrq7TnA3d4GQ2G3x9fTjnfjFnGroturfjOuXfN2uQpm
CN580CwsKEQ9jsp8UB1NBQNQ2ly7.

[15] News, *Facebook Unveils Facebook Ads* (Nov. 6, 2007), https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/.

[16] Facebook Annual Report 2012 (Jan. 30, 2013), https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/FB_2012_10K.pdf.

[17] Meta Annual Report 2021 (Feb. 2, 2022), https://s21.q4cdn.com/399680738/files/doc_financials/2021/q4/FB-12.31.2021-Exhibit-99.1-Final.pdf.

[18] Dani Deahl, *Facebook Restricts Ad Targeting After Anti-Semitism Controversy*, The Verge (Sep. 15, 2017), https://www.theverge.com/tech/2017/9/15/16313916/facebook-restricts-targeting-fields-anti-semitism-ads.

[19] Rae Nudson, *When Targeted Ads Feel a Little Too Targeted*, Vox (Apr. 9, 2020), https://www.vox.com/the-goods/2020/4/9/21204425/targeted-ads-fertility-eating-disorder-coronavirus.

5

CLASS ACTION COMPLAINT

armor to far-right militia groups ahead of the January 6th insurrection,[20] and to market alcohol, gambling, and tobacco to users between thirteen and seventeen years old.[21]

32.    In 2015, Meta Pixel was announced as a tool to refine Meta's targeted advertising.

33.    The Meta Pixel is a mechanism that loads JavaScript code which collects detailed and granular data for every interaction on a page.[22]

34.    Once a third-party company, advertiser, or other entity sets up Meta Pixel on a website, the information collecting and sharing begins.

35.    Importantly, Meta designed Meta Pixel such that Meta receives the information about a website user's actions contemporaneously with those actions. This means that as soon as a website user takes any action on a webpage that includes Meta Pixel, it redirects the user's communications to Meta while the exchange of the communication between the website users and the website is still occurring.

36.    In response to congressional questioning in 2018, Meta stated that the Meta Pixel "provide[s] information about users' activities off Facebook—including information about their device, websites they visit, purchases they make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook."[23]

37.    Meta Pixel allows third parties to create a library which logs every time a website visitor takes an action (an "event") that the third party wants to track (a "conversion"). All of these tracked conversions are then stored so that the third party can analyze the data collected.[24]

---

[20] Mike Isaac, *Meta Plans to Remove Thousands of Sensitive Ad-Targeting Categories*, N.Y. Times (Nov. 9, 2021), https://www.nytimes.com/2021/11/09/technology/meta-facebook-ad-targeting.html.
[21] Kaveh Waddell, *Facebook Approved Alcohol and Gambling Ads Targeting Teens*, Consumer Reports, (July 27, 2021), https://www.consumerreports.org/advertising-marketing/facebook-approved-alcohol-gambling-tobacco-weight-loss-ads-targeting-teens-a1062200831/.
[22] Surya Mattu, Angie Waller, Simon Fondrie-Teitler, & Micha Gorelick, *How We Built a Meta Pixel Inspector*, The Markup (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.
[23] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the Comm. on Com., Sci., and Transp., 94 Cong. 115 (2018) (Post-Hearing Questions).
[24] *Meta for Developers*, Meta Pixel, https://developers.facebook.com/docs/meta-pixel/, (last visited July 17, 2025).

CLASS ACTION COMPLAINT

38.     There are currently more than six million websites using Meta Pixel.[25] On each of those websites, Meta Pixel collects and sends information to Meta via scripts running in a person's internet browser. That data is then delivered to Meta in "data packets" labeled with personally identifiable information ("PII"), including the user's IP address.

39.     If a person is logged in to Facebook when they visit a website where Meta Pixel is installed, Meta is able to link collected data to specific Facebook accounts.

40.     If a person is not logged into Facebook at the time, Meta uses personal information that a user enters in form fields to match them to their Facebook and/or Instagram profile through a process called Advanced Matching. With this process, Meta collects emails, first and last names, phone numbers, birthdates, and addresses, then uses that information to connect event tracking data to a specific Facebook profile.

41.     Even if a person does not have a Facebook account, has never registered for an account, has never so much as looked at a Facebook or Meta privacy policy, and has no intention to ever join any social media at all, Meta still collects data on that person. When asked by Congress about this maintenance of "shadow profiles" with data of nonusers of Facebook, Mark Zuckerberg responded, "[W]e collect data on people who have not signed up for Facebook for security purposes."[26]

42.     Illustrative that Meta has no real controls on data use an collection was in an investigation by The Markup found that Meta Pixel is embedded on the websites of 33 of Newsweek's top 100 hospitals in the United States.[27] The Markup's investigation revealed that Meta Pixels installed on hospitals' websites have been collecting patients' sensitive health information—"including details about their medical conditions, prescriptions, and doctor's appointments"—and sending it to Meta.[28] This packet of data collected by Meta Pixel is connected to a patient's IP address, providing Meta with

---

[25] *Facebook Pixel Usage Statistics*, Built With, https://trends.builtwith.com/analytics/Facebook-Pixel, (last visited July 30, 2025).
[26] Taylor Hatmaker, *Zuckerberg Denies Knowledge of Facebook Shadow Profiles*, TechCrunch (Apr. 11, 2018), https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/.
[27] Feathers et al., *supra*.
[28] *Id.*

CLASS ACTION COMPLAINT

an intimate receipt of information that can be used in combination with other data to identify a specific individual or household.[29]

B. <u>Meta was lurking in the background to eavesdrop on Android Users</u>

43.    Meta used its native applications, running in the background of Android phones, to bridge the divide between the data collected by Meta Pixel on a website and assigning that data to a Meta advertising profile. This scheme allowed Meta to exploit the information they gleaned by eavesdropping to place users into more specific advertising groups.

44.    "This web-to-app ID sharing method bypasses typical privacy protections such as clearing cookies, Incognito Mode and Android's permission controls."[30]

45.    Android users would download and install the Facebook and/or Instagram applications from the Google Play Store.[31]

46.    Users of the application are required to provide Meta login credentials to use the functionality of the Instagram or Facebook applications.[32]

47.    When a user placed the Instagram or Facebook applications into the background, those applications would begin to monitor UDP Ports 12580–12585. The applications were monitoring for the data being transmitted by the Meta Pixel.[33]

48.    When a user opened their browser and navigated to a website that had the Meta Pixel script, the Meta Pixel would then send the information collected to the native application running in the background, where, if the user was logged into the application, the data would be attached to their Meta advertising profile.[34]

49.    When a website was accessed through an Android mobile web browser, the Meta Pixel would transmit the data using WebTRC to UDP ports 12580–12585 to any app on the device that is listening on those ports.

---

[29] *Id.*
[30] *Girish*, et. al., *supra.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

CLASS ACTION COMPLAINT

50.    The researchers who discovered the eavesdropping explained the technical process in the following way:

The entire flow of the _fbp cookie from web to native and the server is as follows:

1.  The user opens the native Facebook or Instagram app, which eventually is sent to the background and creates a background service to listen for incoming traffic on a TCP port (12387 or 12388) and a UDP port (the first unoccupied port in 12580–12585). Users must be logged-in with their credentials on the apps.
2.  The user opens their browser and visits a website integrating the Meta Pixel.
3.  At this stage, websites may ask for consent depending on the website's and visitor's locations.
4.  The Meta Pixel script sends the _fbp cookie to the native Instagram or Facebook app via WebRTC (STUN) SDP Munging.
5.  The Meta Pixel script also sends the _fbp value in a request to https://www.facebook.com/tr along with other parameters such as page URL (dl), website and browser metadata, and the event type (ev) (e.g., PageView, AddToCart, Donate, Purchase).
6.  The Facebook or Instagram apps receive the _fbp cookie from the Meta Pixel JavaScript running on the browser. The apps transmit _fbp as a GraphQL mutation to (https://graph[.]facebook[.]com/graphql) along with other persistent user identifiers, linking users' fbp ID (web visit) with their Facebook or Instagram account.[35]



---

[35] *Id.*

CLASS ACTION COMPLAINT

51. Unlike other cookies that are visible through a typical developer view, the process described here was not visible.[36] The method in which Meta was exploiting Android users was not disclosed to users, nor was it even disclosed to the third parties that had installed Meta Pixel on their websites.[37] Meta took steps to ensure that this process was buried and visible only to itself, and researchers with special training who were specifically looking for this type of security vulnerability.[38]

C. Meta Violated the Android Terms & the Norms of Application Development

52. Android applications are "Sandboxed." Sandboxing "isolates apps from each other and protects apps and the system from malicious apps.[39] "By default, apps can't interact with each other and have limited access to the OS. If app A tries to do something malicious, such as read app B's data or dial the phone without permissions, it's prevented from doing so because it doesn't have the appropriate default user privileges."[40]

53. "You run everything in a sandbox, and there is no interaction within different elements running on it. What this attack vector allows is to break the sandbox that exists between the mobile context and the web context. The channel that exists allowed the Android system to communicate what happens in the browser with the identity running in the mobile app."[41] Here, the way Meta was tracking users and violating their privacy, was by breaking out of the Sandbox.[42]

54. Google Chrome offers users the opportunity to browse the web in "incognito mode."[43]

55. Browsing in "incognito mode" allows a user to browse the internet with more privacy than when signed into a normal session. Instead of site data, site history, and cookies being saved, the

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Android Application Sandbox*, Android Open-Source Project, (June 18, 2025), *https*://source.android.com/docs/security/app-sandbox.
[40] *Girish*, et. al., *supra*
[41] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers,* (June 3, 2025) *https*://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.
[42] *Girish*, et. al., *supra.*
[43] Google Chrome Help, https://support.google.com/chrome/answer/9845881?hl=en#zippy=%2Chow-incognito-mode-works%2Chow-incognito-mode-protects-your-privacy. (last accessed July 30, 2025).

CLASS ACTION COMPLAINT

unique sessions allow a user to browse without the association.[44] Here, Meta ensured that users could not take advantage of that option offered by Chrome.[45]

56.    Session Description Protocol ("SDP") "munging" is when a developer reorders the default settings of WebRTC code to force an action or a form of communication in a particular order.[46]

57.    Here, Meta used SDP munging to reorder the defaults, allowing the Meta Pixel to communicate in real time the harvested data to the UDP and TCP ports.[47] Instead of using channels meant for connection, Meta used them to ensure that data harvested by Metal Pixel could be associated with an individual user.[48] The Facebook and Instagram applications were listening for that data harvested by the Pixel, the code actually shows the applications "listening" on the TCP and UDP ports.[49]

```
$adb shell su -c netstat -untap | \
    grep -wE "12387|12388|12580|12581|12582|12583|12584|\
              12585|12586|12587|12588|12589|12590|12591"

tcp6      0      0 [::]:12387    [::]:*      LISTEN    32731/com.facebook.katana
tcp6      0      0 [::]:12388    [::]:*      LISTEN    842/com.instagram.android
udp6      0      0 [::]:12580    [::]:*                32731/com.facebook.katana
udp6      0      0 [::]:12581    [::]:*                842/com.instagram.android
```

[50]

58.    "Google said the behaviors of Meta ... blatantly violate our security and privacy principles." But Google was not the only web browser "stunned" by the discovery of this eavesdropping. DuckDuckGo Product Director said "[i]t's such a gross violation of people's basic expectations."[51]

59.    "No privacy settings could have stopped what Meta ... did. They circumvented privacy and security protections that Google set up for Android devices."[52]

---

[44] *Id.*

[45] *Girish*, et. al., *supra.*

[46] Philipp Hancke, *Not a Guide to SDP Munging*, (February 11, 2020), https://webrtchacks.com/not-a-guide-to-sdp-munging.

[47] *Girish*, et. al., *supra.*

[48] *See* Goodin, *supra.*

[49] *Girish*, et. al., *supra.*

[50] *Id.*

[51] Shira Ovide, *Meta found a new way to violate your privacy. Here's what you can do.*, (June 6, 2025) https://www.washingtonpost.com/technology/2025/06/06/meta-privacy-facebook-instagram/.

[52] *Id.*

60. In the simplest form, this complaint alleges that even in "incognito mode," a browsing mode designed to stop cookies from tracking an individual, the Meta Pixel cookie bypassed the Android and Google Chrome security features to track the activity of Android phone users.[53]

61. The Meta Pixel is embedded on over 5.8 million websites.[54]

D. Plaintiff's Factual Allegations

62. Plaintiff owns and uses a Samsung smartphone that has the Android operating system installed.

63. Plaintiff has a Facebook account.

64. Plaintiff has an Instagram account.

65. Plaintiff downloaded the Facebook and Instagram applications owned by Meta through the Google Play Store.

66. Plaintiff used his Samsung phone with the Facebook and/or Instagram applications running in the background to visit websites with the Meta Pixel installed, while the eavesdropping process described above was operative, in the period between September 2024 and June 3, 2025.

67. Without Plaintiff's consent and without his knowledge, the Meta Pixel monitored his interactions with the websites he visited, collected his communications, and used the eavesdropping process described above to tie Plaintiff's website behavior to his Facebook and Instagram profiles, thus de-anonymizing and identifying Plaintiff and Plaintiff's web browsing in real time.

68. Meta used this compiled information to create and enhance a comprehensive profile of Plaintiff in its database for the purposes of advertising, making that profile more valuable to Meta based on the identifiable information that Meta wrongfully, illegally, and unscrupulously gained through the eavesdropping technique described above.

69. Meta continues to sell information gleaned from the eavesdropping process that was attributed to the plaintiff's Meta advertising profile.

70. The sale of Plaintiff's Meta advertising profile discloses information gleaned from the eavesdropping to third parties.

---

[53] *Girish*, et. al., *supra.*
[54] *Id.*

CLASS ACTION COMPLAINT

## CLASS ALLEGATIONS

71.     Plaintiff brings this suit as a class action on behalf of himself and on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure Rule 23. This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23. It also satisfies the requirements of Federal Rule of Civil Procedure Rule 23(b)(3), the predominance and superiority requirements for adjudicating this matter as a class action.

72.     The Plaintiff seeks to represent the Nationwide class defined as: (1) Smartphone users whose phones operated on the Android operating system; (2) who had the Facebook and Instagram applications installed on their phone; (3) who browsed websites with the Meta Pixel installed between September 2024 and June 3, 2025; and (4) who had their browsing data collected and attributed to their Meta advertising profiles.[55]

73.     The Nationwide Class will be referred to collectively as the "Class." Excluded from the Class are defendant, any affiliate, parent, or subsidiary of Defendant, any entity in which defendant has a controlling interest, any officer or director of Defendant, and any judge to whom this case is assigned.

74.     *Numerosity:* Members of the class are so numerous that joinder of all members is impracticable. The class is diminished with the exclusion of the above individuals, but its size is still sufficient to make joinder impracticable. Based on the popularity of both the Android operating system and Meta's applications, the class includes hundreds of thousands, if not millions, of individuals.

75.     *Commonality*: This action involves common questions of law and fact which include:

   a.   Whether Meta's conduct was unlawful;

   b.   Whether Meta's action was intentional;

   c.   Whether Meta's action resulted in its unjust enrichment;

   d.   Whether Plaintiff and the Class are entitled to damages, the measure of damages, statutory damages, injunctive relief, and other forms of relief.

---

[55] Plaintiff reserves the right to revise the class definition based on information received during discovery, and prior to a class certification motion.

76. *Typicality*: Plaintiff is typical of the other members of the class as he brings claims based on the common misconduct by Meta, and he is subject to no unique defenses that would make him an atypical class member.

77. *Adequacy of Representation*: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no disabling conflicts of interest, nor is there evidence he is antagonistic or adverse to the other Class Members. Evidence of his adequacy is found in his retainer experienced class counsel, with extensive experience in data privacy matters and complex consumer litigation.

78. *Predominance*: Here, the common questions of fact and law described above predominate over any individual issues. The questions of fact and law predominate over any induvial questions, because Meta acted in a common manner and fashion in relation to all Class Members. Thus, here the above common questions of law and fact predominate sufficient to certify a class under Federal Rule of Civil Procedure 23(b).

79. *Superiority*: Here, class action adjudication is the appropriate and proper method for fair and efficient resolution of the claims. Class action treatment is superior to all other methods of adjudication because it will consolidate this action ensuring that the resources of the parties and the Court are not wasted on duplicative proceedings or redundant evidence, that Class Members will not be subject to incongruent treatment, and that Class Members with modest claims will not bear unduly high costs of litigating those claims against a sophisticated defendant.

**FIRST CLAIM FOR RELIEF**
INTRUSION UPON SECLUSION UNDER CALIFORNIA LAW
(By Plaintiff on Behalf of Nationwide Class)

80. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

81. Plaintiff and Class Members possessed a legally protected privacy interest and a reasonable expectation of privacy in their internet browsing, away from the prying eyes of Meta.

82. Plaintiff and Class Members have a privacy interest in controlling who has access to their browsing activity, preventing dissemination of that data to third parties without their consent, and they

have a right to use the internet without Meta observing their use of websites in a way that identifies them to the Meta corporation.

83.    By overriding the ordinary, standard, privacy, and security controls to link mobile browsing with Facebook and Instagram accounts, Meta intruded on Plaintiff's and Class Members' reasonable expectation of privacy and seclusion. By doing so in a manner that overrode the typical and normal privacy controls of consumer, its actions constitute an egregious breach of norms.

84.    The use of undisclosed technologies, tracking, deanonymizing, and commercial exploitation of the data Meta gleaned through its eavesdropping was an egregious breach of privacy and norms. Quite literally, Meta overrode the ability of an individual to visit websites privately without being spied on by another company whose presence was unknown and unexpected.

85.    Not only were Plaintiff and Class Members the victims of unlawful surveillance by Meta, but Meta used that data to further enrich itself, and protect its advertising revenue stream.

86.    Plaintiff and Class Members seek all available legal and equitable relief for this egregious breach of privacy and seclusion by Meta.

### SECOND CLAIM FOR RELIEF
VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (Wiretapping)
Cal. Penal Code § 631
(By Plaintiff on Behalf of the Nationwide Class)

87.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

88.    The State of California recognizes that new methods of surveillance will develop as time goes on. California Penal Code Section 630 reads:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

89.    The California Wiretapping Act, Cal Penal Code § 631 at all times of the alleged conduct was in full force and effect. The California Wiretapping act provides any person:

CLASS ACTION COMPLAINT

who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

90.    Meta is a person within the meaning of the California Wiretapping Act.

91.    Meta was within the State of California at all relevant times of its conduct alleged herein.

92.    The interactions between Plaintiff, Class Members, and the websites which they accessed through their mobile browsers constitute messages, reports, and/or communications within the scope of the California Wiretapping Act. Plaintiff's and Class Members' interactions with the website are transfers of signals, data, and intelligence, and at all relevant times were transmitted by a wire, line, or cable system. Indeed, internet-based transmissions to or from consumer cell phones require the transmitted data to pass through wire, line, or cable systems during one or more portions of the transmission.

93.    As described in this Complaint, Meta was intercepting in real time and transmitting the contents of these communications and transmitting the contents to themselves without the consent or knowledge of the Plaintiff and Class Members.

94.    Meta intercepted the communications and then deanonymized them, linking the data to individual Facebook and Instagram users.

95.    The native applications Instagram and Facebook installed on Plaintiff's and Class Members' phones constitute machines, instruments, and or contrivances that tapped or made unauthorized connections. Specifically, the Facebook and Instagram applications were listening to traffic on TCP and UDP ports, for the transmission of data recorded, harvested, and redirected to the Facebook and Instagram applications.

96.    Plaintiff and Class Members had and have a reasonable expectation of privacy in their web browsing on their private devices, and did not consent to Meta's electronic eavesdropping.

CLASS ACTION COMPLAINT

97.    Meta planned to use, intentionally used, and continues to use the intercepted communications to generate further revenue for its largest revenue stream, advertising.

98.    While exploiting communications for the commercial benefit of Meta, the contents of the communications were disclosed to third parties.

99.    Meta was aware or should have been aware that its actions were in violation of the California Wiretapping Act. First, Meta hid these interceptions outside of the normal view of consumers, and web developers. Even some of the web developers that were asking questions about why Meta Pixel was communicating to open UDP and TCP ports.[56] Further, Meta knew or should have known that its actions were violations of the Google Chrome Browser privacy policy, the Mozilla Fire Fox privacy policy, and that tracking a person browsing in 'Incognito Mode" and cleared cookies was in violation of the Wiretapping Act. Further, Meta did not voluntarily disclose these techniques; they were discovered by researchers and publicized because of the security vulnerabilities that these wiretapping techniques cause. Meta's steps to hide the manner in which it was recording, harvesting, transmitting, and deanonymizing data illustrate that Meta knew or should have known it was in violation of the Act.

100.    Meta was unjustly and continues to be unjustly enriched by exploiting the data gleaned from the illegal, nonconsensual eavesdropping.

101.    Plaintiff and Class Members injured by Meta's violation of the California Penal Code, and pursuant to California Penal Code §637.2 seek damages for the greater of $5,000 or three times the amount of actual damages, injunctive relief, reasonable attorney's fees, costs, and any other relief the Court deems required.

### THIRD CLAIM FOR RELIEF
VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
Cal. Penal § 635
(By Plaintiff and on Behalf of the Nationwide Class)

102.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

---

[56] *See generally*, Girish, et. al., *supra.*

17
CLASS ACTION COMPLAINT

103.    California Penal Code §635, makes it unlawful for any "person who manufacturers, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another." California Penal Code §635 was in full force and effect during the relevant time periods.

104.    The code created by Meta, in the form of Meta Pixel, Instagram native application code, Facebook native application code, and or the combination of each of these strings of code, were created for the primary purpose of eavesdropping upon the communication of another. Meta manufactured, assembled, sold, offered for sale, posses, and furnished these devices.

105.    Plaintiff and Class Members did not and could not consent to Meta's conduct because they were unaware of the eavesdropping. Meta took proactive steps to conceal the manner in which its eavesdropping occurred, obscuring from consumers and developers the process in the normal developer mode.

106.    As a direct and proximate result of Meta's violation of the Cal. Penal Code §635, Plaintiff and Class members were injured and suffered damages, a loss of privacy, and a loss of value of their PII in an amount to be proven at trial.

107.    Meta was and continues to be unjustly enriched by its violation of Cal. Penal Code §635.

108.    Plaintiff and Class Members seek $5,000 or three times the actual damages, injunctive relief, reasonable attorney's fees, and costs, pursuant to Cal. Penal Code §637.2. The Plaintiff and Class Members also seek any other relief the Court deems appropriate to provide full relief.

### FOURTH CLAIM FOR RELIEF
VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
18 U.S.C. §§ 15211(1), *et seq.*
(By Plaintiff on Behalf of the Nationwide Class)

109.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

110.    The Electronic Communications Privacy Act makes it illegal to intentionally intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication. 18 U.S.C. §2511.

18
CLASS ACTION COMPLAINT

111.    18 U.S.C. §2520(a) provides for a private right of action to any person whole electronic communications are intercepted.

112.    Meta intentionally intercepted electronic communications that Plaintiff and Class Members exchanged with third-party websites when it used Meta Pixel to intercept, record, redirect, communicate, and deanonymize those communications with Plaintiff's and Class Members' Facebook and Instagram accounts.

113.    Plaintiff and Class Members website activity was a communication within the meaning of 18 U.S.C. §2510(2).

114.    Meta was not a party to those communications, but intercepted, redirected, communicated, and linked those communications with Plaintiff's and Class Members' Facebook and Instagram accounts.

115.    The Meta Pixel, Instagram application, and Facebook application all constitute devices under 18 U.S.C. §2510(5).

116.    Plaintiff and Class Members have a reasonable expectation of privacy in their web browsing on their own mobile phones.

117.    Meta intentionally planned to use, used, and continues to use the contents of the intercepted communications, knowing or having reason to know that these actions were an unlawful intercept.

118.    Plaintiff and Class Members were not aware, did not consent, because Meta did not publicize its actions; instead Meta took additional steps to conceal the manner in which they were eavesdropping on Plaintiff and Class Members.

119.    By exploiting the intercepted communications, while knowing the interception was in violation of 18 U.S.C. §2511(a), Meta also violated 18 U.S.C. §2511(1)(d).

120.    Plaintiff and Class Members have suffered damages because of Meta's violation of the Electronic Communications Privacy Act.

121.    Plaintiff and Class Members seek all appropriate relief., including declaratory or equitable relief, actual damages, and disgorgement of profits by Meta as a result of its violations. Plaintiff and Class Members also seek statutory damages, punitive damages, reasonable attorneys' fees,

CLASS ACTION COMPLAINT

and costs pursuant to 18 U.S.C. §2520. Plaintiff and Class Members seek monetary damages for the greater of the sum of actual damages suffered and any profits made by Meta as result of the violation, or statutory damages of $100 a day for each violation or $10,000, whichever is greater.

## FIFTH CLAIM FOR RELIEF
UNJUST ENRICHMENT
(By Plaintiff on Behalf of the Nationwide Class)

122. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

123. Plaintiff and Class Members conferred a benefit on Meta by utilizing Instagram and Facebook accounts through their applications. Meta then utilized those accounts and applications to spy on Plaintiff and Class Members.

124. Meta's acts of spying on Plaintiff and Class Members, then deanonymizing their web browsing, conferred an additional benefit on Meta above and beyond information Meta could have gleaned merely by Plaintiff's and Class Members' use of the Instagram or Facebook applications. Meta used that ill-gotten information to increase the value of the Plaintiff's and Class Members' Meta advertising profile. The more accurate and specific Meta advertising profiles allowed Meta to increase its business revenue and profits.

125. Meta had knowledge that this benefit was conferred upon it.

126. Meta has been unjustly enriched at the expense of Plaintiff and the Class Members and the retention of this benefit under the circumstances would be inequitable.

127. Meta retained that benefit under circumstances that make it unjust and inequitable for Meta to retain it without paying Plaintiff and Class Members the value thereof.

128. Plaintiff seeks an order requiring Defendant to make restitution to him and the other Class Members.

## SIXTH CLAIM FOR RELIEF
Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.
(By Plaintiff on Behalf of Nationwide Class)

129. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though they were fully set forth herein.

20
CLASS ACTION COMPLAINT

130.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

131.    An actual controversy has arisen in the wake of the disclosure of the unlawful Meta Pixel eavesdropping regarding Plaintiff's and Class Members' PII and whether Meta is currently misusing the intercepted data unlawfully.

132.    Plaintiff and the Class allege that Meta has unlawfully intercepted their communications, deanonymized those communications, attributed them to Plaintiff and Class Members, and now continues to exploit that data for Meta's economic benefit.

133.    The continual misuse of private communications continues to devalue that private information and continues the invasion of Plaintiff's and Class Members' privacy. Plaintiff and Class Members are now continually exposed to advertisements based on the exploitation of illegally procured information.

134.    Every sale of Plaintiff's and Class Members' Meta advertising profile constitutes a unique and distinct invasion upon Plaintiff's and Class Members' rights.

135.    Every analysis that Meta runs on the efficacy of advertisements that Plaintiff and Class Members have been exposed to constitutes a unique and distinct invasion of privacy upon Plaintiff and Class Members.

136.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Meta has unlawfully intercepted the communications of Plaintiff and Class Members, in violation of California and Federal Law;

    b.    Meta has illegally attributed that data to Plaintiff's and Class Members' Instagram and Facebook accounts, invading their rights to privacy and seclusion under the common law;

    c.    Meta must delete all ill-gotten information from its records;

    d.    Meta must disassociate all ill-gotten information from the Plaintiff's and Class Members' Meta advertising profiles;

21
CLASS ACTION COMPLAINT

e.  If Meta cannot disassociate all ill-gotten information from Plaintiff's and Class Members' Meta advertising profiles, then Meta must delete the Plaintiff's and Class Members' advertising profiles in their entirety;

f.  Ordering Meta to identify the difference in value of Plaintiff's and Class Members' Meta advertising profiles with the associated information, and the value of the Meta advertising profiles without the associated information; and

g.  Ordering Meta to disclose to Plaintiff and Class Members all of the third parties to whom Meta sold Plaintiff's and Class Members' advertising profiles with the attributed data.

137.  Meta continues to sell advertising based on the illegally obtained data. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy. Plaintiff and Class Members will continue to be exposed to advertising based on illegal information, and will continue to have their privacy and seclusion invaded by Meta. No adequate remedy at law exists to place Plaintiff and the Class Members in the position that they would have been in, but for Meta's daily invasion of privacy and seclusion.

138.  The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Meta if an injunction is issued. The continued use of the illegally obtained information constitutes unique and continued invasions on Plaintiff's and Class Members' common law rights to privacy and seclusion. On the other hand, the cost to Meta of complying with an injunction by removing the attributed information to the accounts of Plaintiff and Class Members is relatively minimal. Meta must simply determine what information came from the Meta Pixel during that time period, then delete it from the users' accounts.

139.  Such an injunction would also benefit other members of the Public not before this Court, because it would disincentive Meta from employing similar eavesdropping techniques going forward. If Meta is aware that it can employ illegal eavesdropping and wiretapping techniques but continue to benefit from that illegal activity even after judicial intervention, then Meta has no incentive to stop its illegal and unequitable conduct. The issuance of an injunction ensures that Meta is properly disincentivized from illegally spying on millions of Americans to sell their private communications.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMAND**

140.    Plaintiff hereby demands a jury trial for all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, requests that this Court:

a) Determine that the claims herein may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and issue an order certifying the class;

b) Appoint Plaintiff as representative of the Class;

c) Appoint Plaintiff's Counsel whose appearance is noticed herein as Class Counsel;

d) Award actual, general, special, incidental, statutory, punitive, exemplary, and consequential damages and restitution to which Plaintiff and Class Members are entitled in amount to be determined at trial; and order Meta to disgorge its ill-gotten gains;

e) Award pre-judgment and post-judgment interest on such monetary relief at the highest legal rate to the extent provided by law;

f) Grant appropriate injunctive relief, requiring Meta to disassociate the illegally obtained information from Plaintiff and Class Members Facebook and Instagram accounts;

g) Award reasonable attorneys' fees and costs to the extent provided by law; and

h) Grant any other form of relief that this Court deems appropriate and necessary to do justice.

Dated: July 30, 2025                                Respectfully submitted,

*/s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (SBN: 236805)
ekim@lcllp.com
**LYNCH CARPENTER, LLP**
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Telephone: (213) 723-0707
Facsimile: (858) 313-1850

*Attorney for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT